On Application for Rehearing

THOMAS, Judge.
The opinion of June 25, 2010, is withdrawn, and the following is substituted therefor.
Sacred Heart Health System, Inc. (“Sacred Heart”), is an out-of-state, not-for-profit corporation that, among other things, provides medical services through three hospitals and other medical facilities located in the northwestern region of Florida. Sacred Heart is also the owner of a multi-specialty physician group known as Sacred Heart Medical Group (“SHMG”). SHMG is made up of 143 physicians practicing in the northwestern area of Florida and the south Baldwin County area of Alabama. The record indicates that SHMG is not a separate legal entity; however, Sacred Heart has presented evidence indicating that the physicians of SHMG have employment contracts with SHMG, *971 that SHMG employees perform consolidated billing for all the SHMG physicians’ patients, that third-party providers like insurers consider SHMG a medical group, and that SHMG physicians all share the same billing number.
Six SHMG physicians provide healthcare services to patients in the south Baldwin County area of Alabama. Because the practices of three of those physicians had increased and an expansion of the physicians’ existing offices was not feasible, Sacred Heart began, as early as 2003, seeking a way to assist those physicians in locating more office space to provide better service to their patients. To that end, Sacred Heart ultimately began negotiations regarding some property upon which it could construct a medical office building (“MOB”). Once the property was secured, Sacred Heart entered into a preconstruction agreement with Colonial Pinnacle MOB, LLC, an affiliate of Johnson Development, LLC, the developer of the MOB project, regarding the construction of and proposed leasing of the MOB from Colonial Pinnacle MOB, LLC, by Sacred Heart. That agreement contained the details of the utilization of the space in the 44,000-square-foot MOB. Included in the space to be leased was an area to house an ambulatory-surgery center,[1] an area for medical-office suites, an area for timeshare space for incremental use by non-SHMG physicians, an area for a diagnostic center, an area for a rehabilitation center, and an area for a laboratory.
Sacred Heart advertised the MOB project as a new facility providing new and improved services to the south Baldwin County area. The information contained on the Sacred Heart Web site about the project explained that the MOB was part of a process to “expand ... services in order to meet the growing health care needs of [the south Baldwin County] area.... This is part of a long-term commitment that Sacred Heart is making to the communities of south Baldwin County.” Other advertisements and information concerning the MOB project indicated that Sacred Heart intended to seek an oncologist to join SHMG and offer services in the MOB, including mammography and CT scans, neither of which were offered by SHMG physicians already practicing in the south Baldwin County area and which would require the purchase of the CT scanner and mammography unit once an oncologist was recruited.
The minutes of a'March 31, 2006, meeting of the Sacred Heart board of directors mention the planning and development of the MOB project. Those minutes state that
“[t]he hospital is currently engaged in a planning process for the construction of a 60,000 square foot office building in Gulf Shores, which would include an ambulatory surgery center, outpatient diagnostic services and physician offices. The construction and operation of an ambulatory surgery center will require a certificate of need, which has been applied for.”
(Emphasis added.) Minutes from the SHMG management board meetings also include references to the planned MOB *972 project. The minutes from April 27, 2006, read:
“We have reserved property on Highway 59, north of the intercoastal waterway, which is large enough to build a 60,000 [square foot] building and are in the process of talking to developers who will build the building. The plan is for an integrated SHMG practice, surgery center, and diagnostic center like in Pace, [Florida], We are in discussions with surgeons to put a surgery center, deal together. We have filed for a [certificate of need] for the surgery center.”
(Emphasis added.) The minutes from the. August 17, 2006, SHMG management board meeting indicate that the group had a letter of intent to purchase the property for the MOB project and mentioned “detailed negotiations” regarding the proposed ambulatory-surgery center to be operated by Pleasure Island Ambulatory Surgery Center, LLC (“PIASC”).[2]
In addition to the reference in the SHMG management board meeting minutes to the medical facility in Pace, Florida, the record contains another reference to the Pace facility. In its announcement regarding the MOB project on the Sacred Heart Web site, Sacred Heart noted that Johnson Development, LLC, had partnered with Sacred Heart to construct similar medical office parks. The Web site specifically referenced, among other locations, the medical office park in Pace, Florida. According to information on the Sacred Heart Web site about Sacred Heart Medical Park in Pace, the Pace facility provides laboratory and imaging services, outpatient-surgery services, rehabilitation services, physical therapy, and also contains physician offices. The Sacred Heart Web site declares that “[t]he new Sacred Heart Medical Park [in Pace] will make it easier for Santa Rosa County residents to receive outpatient services from Sacred Heart, all in one convenient location. This is an important step in the growth of our regional health system.” The Pace facility operates as a part of the Sacred Heart Hospital System.

Procedural History

South Baldwin Regional Medical Center (“South Baldwin”), a health-care facility located in Baldwin County, filed a petition for a declaratory ruling with the State Health Planning and Development Agency (“SHPDA”), requesting that SHPDA declare Sacred Heart’s plans to develop the MOB required Sacred Heart to obtain a certificate of need (“CON”) from SHPDA. Infirmary Health System (“IHS”), another health-care facility that provides health services in the Mobile County/Baldwin County area, intervened in support of the petition. The administrative law judge (“ALJ”) assigned to hear the petition determined that he lacked jurisdiction to decide the matter and remanded the petition to the CON Review Board (“CONRB”). Because neither the CONRB nor the ALJ issued any ruling on the petition within 45 days, see Ala.Code 1975, § 41-22-ll(b) (stating that an agency’s failure to rule on a request within 45 days constitutes a denial of the request), South Baldwin and IHS (hereinafter referred to collectively as “the opponents”) filed a petition for judicial review in the Montgomery Circuit Court. See Ala.Code 1975, § 41-22-20 (explaining the procedure to seek judicial review of an agency decision).
In the petition for judicial review, as originally filed, the opponents sought an order directing that SHPDA conduct a fact-finding proceeding and issue a ruling on the merits of the petition for a deelara- *973 tory ruling. The opponents later amended their petition, requesting that the circuit court declare that the MOB project that Sacred Heart was developing was reviewable under the statutes and regulations pertaining to SHPDA and thus required Sacred Heart to obtain a CON in order to offer health-care services in the MOB. Finally, in their final amended petition and complaint, the opponents sought declaratory and injunctive relief under the Alabama Administrative Procedure Act, Ala.Code 1975, § 41-22-1 et seq.; the Declaratory Judgment Act, Ala.Code 1975, § 6-6-220 et seq.; and § 22-21-276(a), one of the statutes relating to the regulation of health-care facilities, codified at Ala.Code 1975, § 22-21-260 et seq. The opponents specifically requested that the circuit court determine that a CON was required for Sacred Heart to offer health-care services in the MOB and that the circuit court enjoin Sacred Heart from offering those services in the MOB until it obtained a CON.
Although both, Sacred Heart and the opponents each sought a summary judgment in their respective favor, the circuit court denied both motions and set the case for trial. By agreement of the parties, the circuit court did not hold a bench trial; instead, it took the case under submission on a joint submission of evidence. The circuit court entered a judgment determining that the MOB project fell under “the physician’s office exemption” contained in Ala.Code 1975, § 22-21-260(6), and, thus, that it was not the establishment of a new health-care facility, which requires CON review under Ala.Code 1975, § 22-21-263(a)(1). Based on that determination, the circuit court concluded that Sacred Heart was not required to secure a CON to offer health-care services in the MOB. After consideration of a timely filed post-judgment motion, the circuit court amended its judgment to explain that the MOB project qualified for the physician’s office exemption only insofar as the three SHMG physicians who were relocating their south Baldwin County-area offices into the MOB were concerned; however, the circuit court further ruled that adding any additional physicians or providing additional services would require Sacred Heart to obtain a CON before adding such physicians or providing such services in the MOB. Sacred Heart appealed that judgment to the Alabama Supreme Court; the opponents cross-appealed. Our supreme court transferred the appeal and the cross-appeal to this court, pursuant to Ala.Code 1975, § 12-2-7(6). All the parties requested oral argument; this court granted those requests, and oral argument was held on April 21, 2010.

Standard of Review

Our review of the circuit court’s judgment is de novo. Sevigny v. New South Fed. Sav. & Loan Ass’n, 586 So.2d 884, 886 (Ala.1991). “When reviewing a case in which the trial court sat without a jury and heard evidence in the form of stipulations, briefs, and the writings of the parties, this Court sits in judgment of the evidence; there is no presumption of correctness.” Bean Dredging, L.L.C. v. Alabama Dep’t of Revenue, 855 So.2d 513, 516 (Ala.2003) (citing Craig Constr. Co. v. Hendrix, 568 So.2d 752, 756 (Ala.1990), and Old Southern Life Ins. Co. v. Williams, 544 So.2d 941, 942 (Ala.1989)). . However, we note that we should recognize that SHPDA’s interpretation of the statutes governing CON review should be given great weight by this court. Pleasure Island Ambulatory Surgery Ctr., LLC v. State Health Planning & Dev. Agency, 38 So.3d 739, 743 (Ala.Civ.App.2008).

Applicable Statutes

The laws relating to the regulation of health-care facilities are set out in Ala. Code 1975, § 22-21-260 et seq. Section *974 22-21-260(6) defines “health care facility” as follows:
“(6) Health care facility. General and specialized hospitals, including tuberculosis, psychiatric, long-term care, and other types of hospitals, and related facilities such as, laboratories, out-patient clinics, and central service facilities operated in connection with hospitals; skilled nursing facilities; intermediate care facilities; skilled or intermediate care units operated in veterans’ nursing homes and veterans’ homes, owned or operated by the State Department of Veterans’ Affairs, as these terms are described in Chapter 5A (commencing with Section 31-5A-1) of Title 31, rehabilitation centers; public health centers; facilities for surgical treatment of patients not requiring hospitalization; kidney disease treatment centers, including free-standing hemodialysis units; community mental health centers and related facilities; alcohol and drug abuse facilities; facilities for the developmentally disabled; hospice service providers; and home health agencies and health maintenance organizations. The temí health care facility shall not include the offices of private physicians or dentists, whether for individual or group practices and regardless of ownership, or Christian Science sanatoriums operated or listed and certified by the First Church of Christ, Scientist, Boston, Massachusetts, or a veterans’ nursing home or veterans’ home owned or operated by the State Department of Veterans’ Affairs, not to exceed 150 beds to be built in Bay Mi-nette, Alabama, and a veterans’ nqrsing home or veterans’ home owned or operated by the State Department of Veterans’ Affairs not to exceed 150 beds to be built in Huntsville, Alabama, for which applications for federal funds under federal law are being considered by the U.S. Department of Veterans’ Affairs prior to March 18,1993.”
(Emphasis added.)
That same section, § 22-21-260, further defines both “health services” and “institutional health services”:
“(8) Health services. Clinically related (i.e., diagnostic, curative, or rehabilitative) services, including alcohol, drug abuse, and mental health services customarily furnished on either an in-patient or out-patient basis by health care facilities, but not including the lawful practice of any profession or vocation conducted independently of a health care facility and in accordance with applicable licensing laws of this state.
“(9) Institutional health services. Health services provided in or through health care facilities or health maintenance organizations, including the entities in or through which such services are provided.”
Section 22-21-263 provides:
“(a) All new institutional health services which are subject to this article and which are proposed to be offered or developed within the state shall be subject to review under this article. No institutional health services which are subject to this article shall be permitted which are inconsistent with the State Health Plan. For the purposes of this article, new institutional health services shall include any of the following:
“(1) The construction, development, acquisition through lease or purchase, or other establishment of a new health care facility or health maintenance organization.”
Pursuant to § 22-21-265:
“(a) On or after July 30, 1979, no person to which this article applies shall acquire, construct, or operate a new institutional health service, as defined in *975 this article, or furnish or offer, or purport to furnish a new institutional health service, as defined in this article, or make an arrangement or commitment for financing the offering of a new institutional health service, unless the person shall first obtain from the SHPDA a certificate of need therefor....”

Analysis

The issue central to both the appeal and the cross-appeal is whether Sacred Heart is required to obtain a CON before it may offer health-care services in the MOB. Pursuant to §§ 22-21-263(a)(l) and 22-21-265, no new institutional health services may be offered in the state without first securing a CON from SHPDA. Institutional health services are health services provided through health-care facilities and health-maintenance organizations. There is no dispute among the parties that the MOB project does not qualify as a health-maintenance organization. However, the parties are sharply divided over whether the MOB project qualifies as a health-care facility as defined in § 22-21-260(6) or whether it qualifies for an exemption from CON review under that same statute.
Sacred Heart argues that the MOB project fits within the exemption for a physician’s office contained in § 22-21-260(6). The physician’s office exemption, as it is commonly known, contained in the statute does exclude from the definition of “health care facility” “the offices of private physicians or dentists, whether for individual or group practices and regardless of ownership.” § 22-21-260(6). The opponents, however, argue that the MOB project does not qualify for the exemption. Thus, the main question confronting us in these appeals is whether the MOB project is a health-care facility that requires a CON or whether it qualifies as a physician’s, office under the exemption in § 22-21-260(6) and therefore does not require a CON.
The opponents rely on the planned scope of the MOB project in making their argument that the MOB project does not qualify for the physician’s office exemption. They point out that the MOB project was developed and designed to house an ambulatory-surgery center, a rehabilitation center, a laboratory, and diagnostic equipment. Based on Sacred Heart’s own advertisements regarding the MOB project and the minutes of both the Sacred Heart board of directors and the SHMG management board, the opponents contend that the MOB project was designed to offer a wide array of services and to expand Sacred Heart’s presence in the area and not merely to provide a new primary office for SHMG physicians.
Sacred Heart readily admits that any ambulatory-surgery center housed within the MOB would require a CON in order to operate. However, Sacred Heart contends that it was not required to secure a CON for the proposed ambulatory-surgery center because PIASC, the entity that intended to actually provide ambulatory-surgery services in the MOB, sought a CON on its own behalf. Thus, Sacred Heart argues, the fact that a portion of the space it leased in the MOB was intended for use as an ambulatory-surgery center would not prevent the utilization of the remaining parts of the building. Because PIASC was not awarded a CON to operate an ambulatory-surgery center, Sacred Heart says that it will convert the space originally intended to house the ambulatory-surgery center into additional office space for the SHMG physicians or into time-share office space for other, non-SHMG physicians. Therefore, Sacred Heart argues that the fact that the MOB project was intended to house an ambulatory-surgery center should not be considered when determin *976 ing whether the MOB project is or is not a health-care facility under § 22-21-260(6).
The opponents, however, argue that, regardless of PIASC’s attempt to secure a CON for the ambulatory-surgery center, the MOB project was never designed to simply house a multi-specialty practice, but was instead developed to provide new institutional health services to the south Baldwin County area through both the planned ambulatory-surgery center and the recruitment of an oncologist and the necessary purchase of certain equipment for cancer diagnosis.[3] See § 22-21-263(a)(l) (requiring CON review be sought for the development of a new health-care facility). The crux of the argument presented by the opponents is that the MOB project must .be viewed as a whole, not in its various parts, to determine whether the MOB project requires a CON. The opponents rely on various administrative rulings by the CONRB, which indicate that the project should be viewed as a whole to determine whether it qualifies for the physician’s office exemption or whether it is subject to CON review. See CONRB Administrative Ruling Regarding Heart Lung Associates of America, P.C., DR-100 (August 29, 2001) (determining that the project under review, “as a whole,” did not qualify for the physician’s office exemption); CONRB Administrative Ruling Regarding Mobile Urology Group, P.A., DR-116 (March 6, 2008) (“DR-116”) (noting that the determination whether a project falls within the physician’s office exemption must be based on all the evidence in the record before the CONRB and that the CONRB performs “a careful and informed review of the nature of the facility, the relationship of the treating physicians, the technical capability being acquired by the sponsors and the proposed services to be provided” in making such a determination). In fact, in one letter of non-reviewa-bility [4] contained in the record, Alva' Lambert, the Executive Director of SHPDA, indicated that, in reviewing whether a particular project fits within the physician’s office exemption, SHPDA seeks “to understand the scope of the proposal,” indicating that the entire project and not just separate parts of a project must be reviewed to determine whether a project requires CON review as a new health-care facility or whether it qualifies as a physician’s office and is exempt from CON review. Letter of Non-Reviewability Regarding Norwood Clinic, RV2001-18 (May 1, 2001).
The CONRB has set out four criteria it considers when determining whether a *977 particular project meets the physician’s office exemption:
“1. That the proposed services are to be provided, and related equipment used, exclusively by the physicians identified as the owners or employees of the physicians’ practice for the care of their patients.
“2. That the proposed services are to be provided, and related equipment used, at the primary office of such physicians.
“3. That all patient billings related to such services are through, or expressly on behalf of, the physicians’ practice, and not on behalf of a third party.
“4. That the equipment shall not be used for inpatient care, nor by, through or on behalf of a health care facility.”
CONRB Administrative Ruling Regarding The Institute for Advanced Cardiovascular Care, DR-110 (May 3, 2007) (“DR-110”).
Sacred Heart argues that the MOB project qualifies as a physician’s office under the four criteria. Sacred Heart points out that a large portion of the MOB will be used to house the primary offices of SHMG physicians and the diagnostic equipment presently used by those physicians, which was originally located at an office in Foley. That diagnostic equipment, says Sacred Heart, will be utilized only by SHMG physicians. However, evidence presented to the circuit court indicated that SHMG physicians whose primary office will not be within the MOB will utilize the equipment housed within the MOB. According to Sacred Heart, the non-SHMG physicians that use the other areas of the MOB, i.e., the area originally planned to house an ambulatory-surgery center and the time-share space, will not have access to the equipment used for diagnostic purposes by the SHMG physicians with their primary offices in the MOB. As noted earlier, Sacred Heart presented evidence indicating that SHMG physicians all use the same billing number and that all patient billing is handled by a division dedicated to performing that function for all SHMG physicians. Finally, Sacred Heart assures that the equipment housed within the MOB will not be used for inpatient care or be used by, though, or on behalf of any health-care facility.
The opponents, however, disagree with Sacred Heart’s conclusion that the MOB project meets the CONRB’s criteria. Among other things, the opponents rely on DR-116 in arguing that the MOB project “goes beyond a common sense definition of a ‘physician’s office,’ and is subject to review under the CON statutes and regulations.” The CONRB determined in DR-116 that the proposed construction of a new facility to house the group practice Mobile Urology Group, P.A. (“MUG”), MUG’s plan to add six new urologists to the practice, MUG’s anticipated employment of an oncology radiologist, and MUG’s purchase of a VARIAN Medical System for the treatment of certain cancers would require a CON. According to the CONRB, MUG already had two geographical locations and satellite clinics in three smaller communities in Mobile County and Baldwin County. MUG had indicated that it desired the VARIAN Medical System only to assist in its treatment of cancers related to its urology practice; however, the system could be utilized to treat various forms of cancer. In part, the CONRB indicated that it did not have sufficient information before it to support MUG’s claim that the physician’s office exemption would apply to its plan. However, the CONRB further explained that “[t]he far-flung nature of MUG’s practice is particularly significant when viewed in light of the broad capabilities of the [VAR-IAN] Medical System and MUG’s plans to add at least (1) oncology radiologist at the new facility.” The CONRB concluded its ruling by stating that
*978 “[t]here is a point where an out-patient facility, even one developed and owned by physicians, goes beyond a common sense definition of a ‘physician’s office,’ and is subject to review under the CON statutes and regulations. A review of such projects as part of the normal CON process is necessary to prevent the very type of health care duplication and waste that the CON laws were intended to prevent.”
Similarly, in DR-110, the CONRB concluded that a multi-floor facility intended to house a CT scanner, a heart-catheterization laboratory, and space for other medical practices besides the primary cardiovascular groups that intended to develop the facility, which was to be known as the Institute for Advanced Cardiovascular Care (“IACC”), did not qualify for the physician’s office exemption. The CONRB noted that the main problem with the proposed facility was the fact that one physician group owned the equipment and that it intended to share that equipment with another physician group. The CONRB stated that “the design and plans for the facility reflect a different intent, one where multiple physicians use the facility and the on-site equipment for medical procedures in a fashion that is functionally indistinguishable from the services performed in a hospital.” Thus, the CONRB concluded that “the design and structure of this large multi-floor facility reflects an intent to share and use facilities and equipment for the treatment of patients other than just those of the treating physicians whose primary offices are located at the facility” and determined that the IACC facility did not qualify for the physician’s office exemption and required CON review.
Based on the evidence in the record, we cannot agree with Sacred Heart that the MOB project meets the criteria for the physician’s office exemption set out by the CONRB. Like the facility in DR-110, the equipment housed in the MOB would be used for the treatment of patients other than those of the SHMG physicians whose primary office would be located in the MOB. In addition, the scope of the MOB project, as originally designed and developed, reaches in our minds the point referred to by the CONRB in DR-116, “where an out-patient facility, even one developed and owned by physicians, goes beyond a common sense definition of a ‘physician’s office,’ and is subject to review under the CON statutes and regulations.” Thus, we conclude that the MOB project is not exempt from CON review by virtue of the physician’s office exemption.

Conclusion

Viewing the MOB project as a whole and considering the announcements regarding its scope during its early development, this court cannot determine, as Sacred Heart would have us do, that the MOB was designed for use merely as a physician’s office. Although Sacred Heart included in the MOB project space for SHMG physicians’ offices, the scope of the project extended far beyond a mere expansion of the offices of SHMG physicians. The stated purpose of the statutes requiring CON review is “to prevent the construction of unnecessary and inappropriate health care facilities through a system of mandatory reviews of new institutional health services.... ” Ala.Code 1975, § 22-21-261. To allow without CON review the development of a healthcare facility intended to house not only physicians’ offices but also an ambulatory-surgery center, a laboratory, and a rehabilitation center, would undermine the purposes of the CON statutes. See Pleasure Island Ambulatory Surgery Ctr., 38 So.3d at 744. Sacred Heart, by proceeding with the development of the 44,000-square-foot MOB project without seeking either a letter of non-reviewability or a CON, acted prematurely. Sacred Heart’s *979 choice to build first and to hope that a CON would be granted later violates the letter and spirit of the CON statute.
Based on our conclusion that the MOB project does not qualify for the physician’s office exemption, we reverse the judgment of the circuit court and remand the cause for the entry of a judgment declaring that the MOB project, as developed as a whole, does not qualify for the physician’s office exemption because SHMG diagnostic equipment would be used by SHMG physicians whose primary offices are not located in the MOB, and, thus, that it requires CON review. In addition, the circuit court should enjoin Sacred Heart from offering health-care services in the MOB until a CON is secured. In light of our resolution of this issue, we pretermit consideration of the other issues raised by the parties. See Favorite Market Store v. Waldrop, 924 So.2d 719, 723 (Ala.Civ.App.2005) (preter-mitting discussion of additional issues when the decided issue was dispositive of the case).
APPLICATION OVERRULED; OPINION OF JUNE 25, 2010, WITHDRAWN; OPINION SUBSTITUTED; REVERSED AND REMANDED.
THOMPSON, P.J., concurs in the result, without writing.
BRYAN, J., concurs to deny the application for rehearing but concurs in the result as to the opinion, with writing.
PITTMAN, J., dissents, with writing.
MOORE, J., dissents, without writing.

. The area intended to house an ambulatory-surgery center was to be subleased by Sacred Heart to, and operated by, Pleasure Island Ambulatory Surgery Center, LLC (“PIASC”), a group of non-SHMG physicians in which Sacred Heart holds a minority interest. This court recently affirmed, without an opinion, PIASC's appeal from the denial of a certificate of need to operate the ambulatory-surgery center. Pleasure Island Ambulatory Surgery Center, LLC v. State Health Planning & Dev. Agency (No. 2080953, Apr. 16, 2010), 82 So.3d 17 (Ala.Civ.App.2010) (table). The certificate of judgment in that case was issued on May 5, 2010.

. The copy of the redacted minutes from the August 17, 2006, SHMG management board meeting contained in the record is cut off, so only portions of the minutes regarding the development of the MOB project are readable.

. Sacred Heart argues that the specific argument that a CON was required before Sacred Heart developed the MOB project because of the plan for the inclusion of the ambulatory-surgery center was not raised in the circuit court. The opponents, however, say that they challenged the development of the MOB project and its operation from the beginning based on their assertion that, as a whole, the MOB project was new health-care facility and required a CON because of its purposes, design, and the new institutional health services it proposed to offer. We agree that the opponents have challenged the MOB project from its inception with arguments broad enough to cover the argument that the inclusion of the ambulatory-surgery center in the plan for the MOB project required Sacred Heart to seek a CON for the entire MOB project.

. Pursuant to Rule 410-1-7-02(1), Ala. Admin. Code (SHPDA), any person may request, “for informational purposes only,” what is commonly referred to as a letter of non-re-viewability from the executive director of SHPDA:
“Any person may request for informational purposes only a determination as to the current reviewability of an anticipated project or determination of exemption for replacement equipment. Such request shall be submitted in writing disclosing full factual information, supplemented by any additional information or documentation which the Executive Director may deem necessary.”
Sacred Heart did not seek a letter of non-reviewability regarding the MOB project.