After Remand from the Alabama Supreme Court of Case No. 2090239

THOMAS, Judge.
This court’s prior judgment has been reversed and the cause remanded by the Alabama Supreme Court. Ex parte Sacred Heart Health Sys., Inc., 155 So.3d 980, 984 (Ala.2012). In compliance with the directive set out in that opinion, we remand the cause to the trial court for 90 days for that court to conduct “any further proceedings it deems necessary and for the trial court to apply the [physician’s office exemption] application test [set out in our supreme court’s opinion] to the [Sacred Heart Medical Group] leased space in the medical-building project in a manner consistent with [our supreme court’s] opinion.” 155 So.3d at 988.
REMANDED WITH INSTRUCTIONS.
THOMPSON, P.J., and PITTMAN, BRYAN, and MOORE, JJ., concur.

On Return to Remand in Case No. 2090239

THOMAS, Judge.
This is the second time these parties have appeared before this court. Sacred Heart Health Sys., Inc. v. Infirmary Health Sys., 155 So.3d 969 (Ala.Civ.App.2010). Sacred Heart Health System, Inc. (“Sacred Heart”), again appeals from the trial court’s judgment in a declaratory-judgment action instituted by Infirmary Health System (“IHS”) and South Baldwin Regional Medical Center (“South Baldwin”).
As explained in our earlier opinion,
*991 “[Sacred Heart] is an out-of-state, not-for-profit corporation that, among other things, provides medical services through three hospitals and other medical facilities located in the northwestern region of Florida. Sacred Heart is also the owner of a multi-specialty physician group known as Sacred Heart Medical Group (‘SHMG’). SHMG is made up of 143 physicians practicing in the northwestern area of Florida and the south Baldwin County area of Alabama. The record indicates that SHMG is not a separate legal entity; however, Sacred Heart has presented evidence indicating that the physicians of SHMG have employment contracts with SHMG, that SHMG employees perform consolidated billing for all the SHMG physicians’ patients, that third-party providers like insurers consider SHMG a medical group, and that SHMG physicians all share the same billing number.
“Six SHMG physicians provide healthcare services to patients in the south Baldwin County area of Alabama. Because the practices of three of those physicians had increased and an expansion of the physicians’ existing offices was not feasible, Sacred Heart began, as early as 2003, seeking a way to assist those physicians in locating more office space to provide better service to their patients.”
Sacred Heart Health Sys., 155 So.3d at 970-71.[1] As part of its plan to provide more space to its Baldwin County physicians, Sacred Heart began working with a developer to develop a medical-office building (“the MOB”) in which, among other things, space for physicians’ offices would be leased by Sacred Heart. Id. at 971. Early in the development of the project, the plans for the MOB called for space for a rehabilitation clinic; the plans also called for space for an ambulatory, or outpatient, surgery center, a walk-in care clinic, and laboratory and diagnostic facilities. Id. at 971.
The procedural history of this case was, in large part, also set out in our earlier opinion:
“[South Baldwin], a health-care facility located in Baldwin County, filed a petition for a declaratory ruling with the State Health Planning and Development Agency (‘SHPDA’), requesting that SHPDA declare Sacred Heart’s plans to develop the MOB required Sacred Heart to obtain a certificate of need (‘CON’) from SHPDA. Infirmary Health System (THS’), another health-care facility that provides health services in the Mobile County/Baldwin County area, intervened in support of the petition. The administrative law judge (‘ALJ’) assigned to hear the petition determined that he lacked jurisdiction to decide the matter and remanded the petition to the CON Review Board (‘CONRB’). Because neither the CONRB nor the ALJ issued any ruling on the petition within 45 days, see Ala.Code 1975, § 41-22-11(b) (stating that an agency’s failure to rule on a request within 45 days constitutes a denial of the request), South Baldwin and IHS (hereinafter referred to collectively as ‘the opponents’) filed a petition for judicial review in the Montgomery Circuit Court. See Ala.Code 1975, § 41-22-20 (explaining the procedure to seek judicial review of an agency decision).
“In the petition for judicial review, as originally filed, the opponents sought an order directing that SHPDA conduct a fact-finding proceeding and issue a ruling on the merits of the petition for a declaratory ruling. The opponents later amended their petition, requesting that the circuit court declare that the MOB project that Sacred Heart was developing was reviewable under the statutes and regulations pertaining to SHPDA and thus required Sacred Heart to obtain a CON in order to offer health-care services in the MOB. Finally, in their final amended petition and complaint, *992 the opponents sought declaratory and injunctive relief under the Alabama Administrative Procedure Act, Ala.Code 1975, § 41-22-1 et seq.; the Declaratory Judgment Act, Ala.Code 1975, § 6-6-220 et seq.; and § 22-21-276(a), one of the statutes relating to the regulation of health-care facilities, codified at Ala. Code 1975, § 22-21-260 et seq. The opponents specifically requested that the circuit court determine that a CON was required for Sacred Heart to offer health-care services in the MOB and that the circuit court enjoin Sacred Heart from offering those services in the MOB until it obtained a CON.
“Although both Sacred Heart and the opponents each sought a summary judgment in their respective favor, the circuit court denied both motions and set the case for trial. By agreement of the parties, the circuit court did not hold a bench trial; instead, it took the case under submission on a joint submission of evidence. The circuit court entered a judgment determining that the MOB project fell under ‘the physician’s office exemption’ contained in Ala.Code 1975, § 22-21-260(6), and, thus, that it was not the establishment of a new healthcare facility, which requires CON review under Ala.Code 1975, § 22-21-263(a)(l). Based on that determination, the circuit court concluded that Sacred Heart was not required to secure a CON to offer health-care services in the MOB. After consideration of a timely filed post-judgment motion, the circuit court amended its judgment to explain that the MOB project qualified for the physician’s office exemption only insofar as the three SHMG physicians who were relocating their south Baldwin County-area offices into the MOB were concerned; however, the circuit court further ruled that adding any additional physicians or providing additional services would require Sacred Heart to obtain a CON before adding such physicians or providing such services in the MOB. Sacred Heart appealed that judgment to the Alabama Supreme Court; the opponents cross-appealed. Our supreme court transferred the appeal and the cross-appeal to this court, pursuant to Ala.Code 1975, § 12-2-7(6). All the parties requested oral argument; this court granted those requests, and oral argument was held on April 21, 2010.”
Sacred Heart Health Sys., 155 So.3d at 972-73.[2]
After oral argument, this court released our opinion reversing the trial court’s judgment and determining that “the MOB project, as developed as a whole, does not qualify for the physician’s office exemption because SHMG diagnostic equipment would be used by SHMG physicians whose primary offices are not located in the MOB, and, thus, that it requires CON review.” Id. at 979. This court relied on criteria the CONRB had utilized in determining whether the physician’s office exemption (“the POE”), which exempts certain entities from the CON process, see Ala.Code 1975, § 22-21-260(6), applied, which criteria had been set out in CONRB administrative rulings. Specifically, we relied on the test set out in the CONRB’s administrative ruling regarding The Institute for Advanced Cardiovascular Care; under that test, in order to show that the POE applies and that applying for a CON is unnecessary, the following criteria must be met:
“ 1. That the proposed services are to be provided, and related equipment used, exclusively by the physicians identified as the owners or employees of the physicians’ practice for the care of their patients.
“ ‘2. That the proposed services are to be provided, and related equipment used, at the primary office of such physicians.
“ ‘3. That all patient billings related to such services are through, or expressly on behalf of, the physicians’ practice, and not on behalf of a third party.
*993 “ ‘4. That the equipment shall not be used for inpatient care, nor by, through or on behalf of a health care facility.’ ”
Sacred Heart Health Sys., 155 So.3d at 977 (quoting CONRB Administrative Ruling Regarding The Institute for Advanced Cardiovascular Care, DR-110 (May 3, 2007)).
Sacred Heart then sought certiorari review of our decision. Our supreme court stated the issue presented to it thusly:
“The contested issue between the parties is whether the portion of the medical-building project Sacred Heart has leased for its Baldwin County physicians to use (‘the SHMG leased space’) is subject to Sacred Heart’s first obtaining a CON from SHPDA.2
“2 In examining the medical-building project as a whole, this Court does not refer to the entire building constructed by Johnson Development, which contains space for medical and non-medical uses, but to the portion of the building leased by the specific physicians’ practice seeking to apply the physician’s office exemption to the CON requirement. In this case, we review the SHMG leased space because that is the only space to be used by the SHMG practice.”
Ex parte Sacred Heart Health Sys., Inc., 155 So.3d 980, 983 (Ala.2012) (first and second emphasis added).[3] After considering the arguments presented by Sacred Heart, our supreme court reversed the decision of this court, determining that the four-part test for determining the application of the POE set out by the CONRB, which the supreme court referred to as “the Heart-Lung test,” should be modified. Ex parte Sacred Heart, 155 So.3d at 987. Our supreme court explained:
“This Court has reviewed the Heart-Lung test and given it great weight, has considered the problems with the application of the test that have arisen in this case, and has given the words in the POE ‘their natural, plain, ordinary, and commonly understood meaning.’ IMED Corp.[ v. Systems Eng’g Assocs. Corp.], 602 So.2d [344,] 346 [(Ala.1992) ]. We conclude that the Heart-Lung test is substantially sound but that it should be modified to be consistent with the purpose and policy of the POE and to reflect the legislative intent expressed in § 22-21-260(6). We hereby adopt a modified four-part test[5] to be used to determine whether a proposed medical facility or project qualifies for the POE (hereinafter referred to as ‘the POE application test’):
“(1) The proposed services are to be provided, and related equipment used, exclusively by the physicians identified as owners or employees of the physicians’ practice for the care of their patients.
“(2) The proposed services áre to be provided, and related equipment used, at any office of such physicians.
“(3) All patient billings related to such services are through, or expressly on behalf of, the physicians’ practice.
“(4) The equipment shall not be used for inpatient care, nor by, through, or on behalf of a health-care facility.
“5 We have changed the phrase ‘the primary office’ to ‘any office’ in the second part of the test and have struck the phrase ‘and not on behalf of a third party’ in the third part because of a potential conflict with the phrase ‘regardless of ownership’ in the statutory language of the POE. Ex parte McLeod, 718 So.2d 682, 690 (Ala.1997) (‘An administrative agency’s interpretation of a statute will not be given deference if it is contrary to the legislative intent.’). See also Ex parte Crestwood Hosp. & Nursing Home, Inc., 670 So.2d *994 45, 47 (Ala.1995) (‘It is settled law that the provisions of a statute will prevail in any case in which there is a conflict between the statute and a state agency regulation.’).”
Id. at 987-88.[4] Our supreme court remanded the cause to this court for us to remand the cause to the trial court for it to apply the newly modified POE application test. Id. at 988. The specific remand instructions provided by our supreme court required the trial court to conduct “any further proceedings it deems necessary and for the trial court to apply the POE application test to the SHMG leased space in the medical-building project in a manner consistent with this opinion.” Id.
Following the remand order from this court, the trial court, at the request of the parties, permitted limited discovery and held a hearing. The trial court entered an order on April 10, 2013, in which it made the following findings and conclusions:
“The Sacred Heart medical park was developed per the joint agreement of Sacred Heart Health System Inc. and Colonial Pinnacle MOB, LLC, an affiliate of Johnson Development, LLC. Colonial Pinnacle owns the medical park but Sacred Heart is the major tenant and holds seven leases for a majority of the usable footage.
“Sacred Heart Health System Inc. is a Florida based operator of hospitals and other health care facilities. Sacred Heart Health System also employs approximately 143 physicians, including approximately six physicians who practice in Baldwin County. The physician practices operate under the moniker of the Sacred Heart Medical Group (‘SHMG’). However, the SHMG is not a legal entity but a unit of Sacred Heart Health System Inc., and all operating income and expenses of the SHMG are included in the consolidated financial statement for Sacred Heart Health System, Inc.
“The Sacred Heart medical park was developed to provide space for Sacred Heart’s physicians in Baldwin County, and to also offer the following services: outpatient surgery center, a diagnostic center, a laboratory, [5] and a rehabilitation center. None of these services are presently offered by Sacred Heart’s physicians in Baldwin County.
“The Court concludes that the medical park contains leaseholds for multiple facilities that do not satisfy the POE application test. All seven leases, as amended, vary in the footage leased and the lease rate per square foot. For example, the Family Care lease where Drs. Eslava and Taylor practice is $23.46 a square foot as compared to $44.86 a square foot for the ambulatory surgery center; $33.80 a square foot for the diagnostic center; and $30.54 a square foot for Same Day Walk In. Sacred Heart clearly does not treat these facilities as one physician’s office, but as separate facilities.
“Focusing on the specific leases, the diagnostic center and ambulatory surgery center are not leased as physicians’ practices; and the leases are in the name of Sacred Heart Health System. From the evidence, it also appears that the Same Day Walk In clinic will be operated as an outpatient clinic as defined by [Ala.Code 1975,] § 22-21-260(8).[6] Therefore, in focusing on the *995 ‘specific physicians’ practice,’ the Court concludes that the medical park contains at least three facilities that are not per se physicians’ offices and that it would circumvent the CON law to apply the POE to a facility that is not a physician’s office.
“Based upon all of these findings, the Court therefore concludes that the POE does not apply to the leaseholds for the ambulatory surgery center, the diagnostic facility and the Same Day Walk In, and that a Certificate of Need is required for these facilities. Specifically, the Court finds and holds that these facilities and/or the services provided therein: (1) will not be used exclusively by the physicians identified as owners or employees of the physicians’ practices for the care of their patients; (2) the proposed services and related equipment will not be used at an office of the physician; (3) patient billing for services will not be through or on behalf of the physician’s practice; and (4) the equipment will be used by, through, and on behalf of a health care facility.
“In adopting the POE application test, the Alabama Supreme Court stated further: ‘The POE application test ... should not be interpreted as circumventing the statutory language in §§ 22-21-260(6), 22-21-260(8), 22-21-263, and 22-21-265, Ala. Code 1975, or otherwise applicable statutes or administrative regulations pursuant to the “State Health Plan,”’ [155 So.3d at 988]. The Court finds that upon viewing the project as a whole, including its initial development on behalf of Sacred Heart, applying the POE to the entire medical park would circumvent the statutory language in §§ 22-21-260(6), 22-21-260(8), 22-21-263, and 22-21-265.
“In addition, § 22-21-263(a)(2) provides that new institutional health services for which a CON must be obtained include new annual operating expenses by or on behalf of a health care facility in the amount of $800,000 adjusted annually for inflation. According to the evidence on remand, the annual operating costs to Sacred Heart for the leasehold interests now exceed the threshold in § 22-21-263(a)(2) by over $400,000. The Court therefore concludes that it would circumvent the statutory language to apply the POE to an entire medical park that will house multiple health care facilities as defined by Ala.Code [1975,] §§ 22-21-260(6) and 22-21-260(8), and the cost of which exceed the threshold in § 22-21-263(a)(2).
“Based on the above, the Court declares that Defendant Sacred Heart Health System must obtain a Certificate of Need from the State Health Planning and Development Agency. Accordingly, JUDGMENT is hereby entered in favor of [IHS and South Baldwin].”
(Capitalization in the original.)
We received the trial court’s order on return to remand in case no. 2090239. Because on remand the trial court reversed its earlier decision and held that the MOB, in its entirety, did not meet the four-part POE application test, Sacred Heart filed a new appeal from that order, which this court assigned case no. 2120658. We have consolidated the two appeals.
The first argument Sacred Heart makes on appeal is that the trial court exceeded the scope of the instructions on remand in making its determination that the MOB as a whole was subject to the requirement that Sacred Heart first seek and receive a CON. According to Sacred Heart, the trial court was limited by the remand instructions to consider only the “SHMG leased space,” which includes only that space in the MOB leased by Sacred Heart for its SHMG physicians in Baldwin County. Sacred Heart specifically relies on the language of note 2 in Ex parte *996 Sacred Heart, in which our supreme court stated:
“In examining the medical-building project as a whole, this Court does not refer to the entire building constructed by Johnson Development, which contains space for medical and non-medical uses, but to the portion of the building leased by the specific physicians’ practice seeking to apply the physician’s office exemption to the CON requirement. In this case, we review the SHMG leased space because that is the only space to be used by the SHMG practice.”
Id. at 983 n. 2. Instead of following our supreme court’s instructions, contends Sacred Heart, the trial court considered all the portions of the MOB, including the space originally planned to house an outpatient surgery center,[7] in determining whether the POE application test was satisfied. Sacred Heart points to the language used by our supreme court in its opinion in making the argument that, on remand, the trial court was limited to considering only those portions of the MOB that were leased to the SHMG physicians in its application of and analysis of the factors in the POE application test.
IHS argues that the trial court did not violate the remand instructions and that it carefully considered each separate leasehold in the MOB to determine whether each of them satisfied the POE application test; according to IHS, the trial court held, by omitting them from discussion, that four specific leaseholds — those leaseholds covered by what the parties refer to as the “primary-care” lease, the “medical oncology” lease, the “co-op timeshare”. lease, and the “community room” lease— satisfy the POE application test. Further, IHS contends that the trial court did not conclude that a CON is required for the MOB itself, just for certain leaseholds. Thus, under its analysis, IHS asserts that the trial court properly considered the issues on remand.
South Baldwin contends that our supreme court did not exclude from the trial court’s consideration any portion of the MOB. According to South Baldwin, our supreme court stated that the MOB must be viewed as a whole, despite the language of note 2 in Ex parte Sacred Heart, which, as noted above, Sacred Heart insists limits review of the MOB to that area leased for the use of the SHMG physicians. South Baldwin appears to treat the term “SHMG leased space” as if it means “space in the MOB leased by Sacred Heart.” South Baldwin argues that our supreme court did not limit the space to be considered when applying the POE application test by use of the term “SHMG leased space.” Instead, South Baldwin contends, the term “SHMG leased space” was used merely to delineate between the space in the MOB retained by the developer and the space leased by Sacred Heart. We cannot agree.
As noted above, our supreme court stated the issue under consideration to be “whether the portion of the medical-building project Sacred Heart had leased for its Baldwin County physicians to use (‘the SHMG leased space’) is subject to Sacred Heart’s first obtaining a CON from SHPDA.” Ex parte Sacred Heart, 155 So.3d at 983. Before stating the issue, the opinion explained that the MOB had origi *997 nally been designed to house a rehabilitation center and an outpatient surgery center. Id. at 982. However, our supreme court noted, Sacred Heart had abandoned the plan to lease space for a rehabilitation center before construction of the MOB had been completed and the entity that planned to lease and operate the area originally conceived of as an outpatient surgery center had not secured the required CON to provide outpatient surgery services. Id. at 994; see also supra note 7. Thus, Sacred Heart contends, our supreme court considered those particular aspects of the MOB to be irrelevant to the application of the POE application test. Furthermore, Sacred Heart points out, our supreme court stated that “Sacred Heart intends for the SHMG physicians practicing in the medical-building project to provide a family practice, walk-in care, and laboratory and diagnostic facilities.” Id. at 982. According to Sacred Heart, our supreme court intended for the POE application test to be applied to those spaces — the spaces intended to be used by the SHMG physicians to provide family practice, walk-in care, and laboratory and diagnostic services — and not to the outpatient surgery center or the rehabilitation center.
Our reading of the supreme court’s opinion convinces us that the space planned to house the proposed outpatient surgery center and the space originally planned to house the proposed rehabilitation center are not to be considered in applying the POE application test. The plans for those spaces in the MOB, according to our supreme court, were either abandoned or have not come to fruition because of a failure to secure a CON. Id. at 991. In addition, neither of those spaces was intended to be used by the SHMG physicians, the entity seeking application of the POE to the MOB. See id. at 988. Thus, we agree with Sacred Heart that the trial court erred in considering those spaces within the MOB when applying the POE application test on. remand. Our decision is fully supported by the specific language of note 2 in Ex parte Sacred Heart, in which our supreme court limited its review to that aspect of the trial court’s judgment that applied to “the SHMG leased space because that is the only space to be used by the SHMG practice.” Id. at 983.
However, despite our agreement with that argument presented by Sacred Heart, the error committed by the trial court in considering the outpatient-surgery-center space is, in the present case, an error that does not require reversal of the trial court’s order on remand. Because the trial court applied the POE application test to the portions of the MOB project to be utilized by the SHMG physicians, as required by the supreme court’s remand instructions, we will consider whether its conclusion that those areas fail to meet the POE application test is legally correct. As we will explain below, based on our review of the evidence submitted to the trial court, we hold that the trial court’s conclusion that the SHMG leased space does not meet the four-part POE application test is not supported by the evidence.
The trial court was required to determine whether the SHMG leased space met the four-part POE application test. The first factor of the POE application test required the trial court to decide, based on the evidence, whether the services proposed to be provided in the SHMG leased space were to be provided exclusively by SHMG physicians to their patients and whether the equipment to be used in providing those services was to be used exclusively by SHMG physicians for the care of their patients. We agree with Sacred Heart that the evidence does not support the trial court’s conclusion that SHMG physicians will not be the only physicians to provide the services and to use the equipment at the SHMG leased space in the MOB.
*998 In presenting their view of the evidence, South Baldwin and IHS make much of press releases indicating that the plan for the MOB mirrored that of a similar Sacred Heart medical park in Pace, Florida, which houses physicians’ offices and a laboratory and diagnostic center that provides services as an outpatient diagnostic center operated by Sacred Heart. Indeed, the minutes of an April 27, 2006, meeting of the Sacred Heart board of directors indicates that the board discussed the MOB as being “like” the building in Pace. In excerpts of the August 29, 2008, deposition of Peter Heekathorn, the executive vice president of Sacred Heart and the president of SHMG, Heekathorn explained that the reference to the Pace facility in the minutes of the board-of-directors meeting was meant to indicate that the services being offered at the MOB would be similar to the services offered at the Pace facility. However, Heekathorn stated in that same deposition that the laboratory and diagnostic center in the MOB would not be used to offer outpatient services but would serve only the SHMG physicians practicing in Baldwin County. He testified that only SHMG physicians could use the laboratory and diagnostic center in the MOB and that non-SHMG physicians, including any timeshare physicians that might use office space in the MOB, would not be not be permitted to send patients to the laboratory and diagnostic center housed in the MOB. Many of those same statements are contained in an affidavit Heekathorn executed on October 10, 2008.
Tammy Nall, the administrative director of real-estate operations and corporate travel for Sacred Heart, likewise testified in her October 13, 2008, affidavit that the laboratory and diagnostic center in the MOB would be used solely by SHMG physicians. Nall’s and Heckathorn’s testimony is supported by Sacred Heart’s answers to interrogatories propounded to it on remand. In those answers, Sacred Heart states that “[a]U physicians, nurses, and support staff working in the [SHMG leased space in the] MOB are employed by SHMG.” Thus, other than comments at a board meeting referring to the MOB as being “like” a similar building in Pace, Florida, and some advertisements that might indicate that the MOB was a medical park operated by Sacred Heart, the evidence of record indicates that the SHMG leased space in the MOB and the equipment housed there will be used exclusively by SHMG physicians to diagnose and treat them patients.
The second factor of the POE application test required the trial court to consider whether the services to be provided would be provided and the equipment to be used would be used at “any office of such physicians.” Our supreme court specifically modified this factor of the test, changing the term “the primary office” to the term “any office,” stating that limiting a physician to providing services or using equipment only in his or her primary office might conflict with the phrase “regardless of ownership” contained in § 22-21-260(6) (creating the POE by excluding from the definition of “health care facility” “the offices of private physicians ..., whether for individual or group practices and regardless of ownership....”). See Ex parte Sacred Heart, 155 So.3d at 987 n. 5. The evidence relating to the SHMG physicians who planned to relocate to the MOB indicates that the MOB office would be their primary office. Furthermore, the evidence indicates that the equipment that the SHMG physicians had used in diagnosing and treating their patients had been housed either in the individual physician’s office or in a facility in Foley that was used by all the Baldwin County SHMG physicians. According to Heckathorn’s testimony, all the diagnostic equipment that had been housed in the Foley facility and in the physicians’ offices was to be *999 moved into the MOB laboratory and diagnostic center for continued use by SHMG physicians. Thus, the question to be resolved is whether the fact that all the SHMG-owned diagnostic equipment would be housed in one location in the MOB meets the requirement that “related equipment [be] used[ ] at any office of such physicians.” Based on our review of the record, none of the evidence supports the conclusion that the laboratory and diagnostic center, by providing a localized space within the SHMG leased space of the MOB to house all the diagnostic equipment owned by the SHMG physicians, fails to meet the second factor of the POE application test.
The trial court also determined that the laboratory and diagnostic center and walk-in clinic area of the SHMG leased space in the MOB failed to meet the third factor of the POE application test, which requires all patient billings to be made “through, or expressly on behalf of, the physicians’ practice.” Heckathorn testified in his October 10, 2008, affidavit that all billing for SHMG physicians was done by SHMG and that the money received as a result of those billings is treated as the receipts of SHMG. In the excerpts from her deposition, Denise Barton, the vice president of business development for Sacred Heart, likewise testified that all billing for SHMG physician services was performed by a separate billing group for SHMG.
Regarding the walk-in clinic portion of the SHMG leased space, Heckathorn, in an affidavit he executed on October 23, 2008, explained that the walk-in clinic would not be a “freestanding emergency department,” that it would not operate 24 hours a day or 7 days a week, that it would not provide trauma care, and that it would not have access to “advanced technology.” In her August 26, 2008, deposition, Nall testified that the walk-in clinic space would provide same-day appointment care and not “urgent care,” although the term “urgent care” had been used interchangeably at some points during the planning for the MOB. Barton testified that Dr. Cynthia Harbaugh, an SHMG physician, had been providing same-day, walk-in care at her office in Orange Beach and that she and other SHMG physicians housed in the MOB would continue to provide that care in the MOB. Nall explained in her affidavit that the walk-in clinic area of the MOB would allow “the segregation of [walk-in clinic] patients, many of whom may have cold, fever, flu, and injuries, from patients seeking routine and chronic care.” Although the spaces housing the walk-in clinic, the laboratory and diagnostic center, and the family-practice area were “physically distinct,” Nall explained that “all of the space will function in a coordinated and integrated manner on behalf of SHMG patients.”
The evidence, therefore, does not support the conclusion that patients receiving treatment or diagnosis at either the laboratory and diagnostic center or the walk-in clinic area of the MOB would not be billed by or on behalf of SHMG. Because SHMG has its own billing department, which bills all SHMG-physician-provided services to SHMG patients, and because the record reflects that the walk-in clinic would be operated solely by SHMG physicians, as Dr. Harbaugh had always operated her office to treat persons in need of care for non-trauma ailments or injuries without an appointment, we cannot agree that these areas of the MOB do not meet the requirement that the patient billings for such services be “through, or expressly on behalf of,” SHMG.[8]
*1000 Finally, we consider whether the trial court correctly determined that the SHMG leased space in the MOB fails to meet the fourth factor of the POE application test, which prohibits use of the equipment for inpatient care or by, through, or on behalf of a health-care facility. As noted above, the evidence contained in the record establishes that the equipment contained in the SHMG leased space will be used “exclusively by the physicians identified as owners or employees of the physicians’ practices for the care of their patients.” Ex parte Sacred Heart, 155 So.3d at 986. As we have already explained, Heckathorn testified that non-SHMG physicians would not be permitted to use the SHMG laboratory and diagnostic center.
Based on the evidence, we conclude' that the SHMG leased space, which consists of the family-practice area, the walk-in clinic, and a laboratory and diagnostic center, satisfies the POE application test. The evidence indicates that the SHMG leased space will be used “exclusively by the physicians identified as owners or employees of the physicians’ practices for the care of their patients” and that the services to be provided in the SHMG leased space in the MOB will be provided in the offices of SHMG physicians. Further, the evidence demonstrates that all patient billing will be done by SHMG or on its behalf and that the equipment housed in the SHMG leased space in the MOB will not be used for inpatient care or by a health-care facility.
In its order on remand, the trial court considered facts such as the different build-out costs of the various leases, which, it said, indicated that “Sacred Heart clearly does not treat these facilities as one physician’s office, but as separate facilities.” The POE application test does not contain a factor for which the build-out costs of the various leases would be a relevant consideration. Thus, we have not considered the build-out costs of the various leases in determining whether the evidence supported the trial court’s conclusion that the SHMG leased space does not qualify for the POE.
The trial court went further than applying the four factors of the POE application test, stating that “applying the POE to the entire medical park would circumvent the statutory language in §§ 21-22-260(6), 22-21-260(8), 22-221-263, and 22-21-265.” The trial court’s basis for doing so was our supreme court’s statement that “[t]he POE application test ... should not be interpreted as circumventing the statutory language in §§ 22-21-260(6), 22-21-260(8), 22-21-263, and 22-21-265, Ala.Code 1975...." Ex parte Sacred Heart, 155 So.3d at 988. However, we must agree with amicus curiae, The Medical Association of Alabama, that the trial court erred in considering our supreme court’s statement as adding a fifth factor that would override the four factors set out in the POE application test. Our reading of our supreme court’s opinion convinces us that our supreme court was merely stating that the POE application test, which provides an exemption from CON review for physicians’ offices, is not intended to circumvent the requirements in §§ 22-21-260(6), 22-21-260(8), 22-21-263, and 22-21-265, which require CON review for new institutional health services provided by healthcare facilities, because health-care facilities, by definition, do not include “the offices of private physicians or dentists.” § 22-21-260(6). The statement that the POE application test should not be construed as circumventing the statutes governing the necessity for a CON did not *1001 create an additional factor to be considered by the trial court in applying the POE application test. The trial court was not ordered to, and, in fact, should not have, determined whether applying the POE to the SHMG leased space in the MOB would “circumvent” the statutory language in §§ 22-21-260(6), 22-21-260(8), 22-21-268, and 22-21-265. By doing so, the trial court, much like this court in Sacred Heart Health System, injected a subjective factor into a test that our supreme court has indicated should be limited to the four objective factors set out in its opinion. The trial court’s only function on remand was to consider the POE application test set out in Ex parte Sacred Heart and to apply the factors of that test to the facts in the record or those facts developed in any proceedings held on remand.
As a final consideration in its order on remand, the trial court considered the application of § 21-22-263(a)(2), which prohibits “[a]ny expenditure by or on behalf of a health care facility ... which, under generally accepted accounting principles consistently applied, is ... in excess of eight hundred thousand dollars ($800,000) for new annual operating costs indexed annually for inflation.” Based on § 21-22-268(a)(2), the trial court concluded that Sacred Heart was required to apply for a CON because the cost of all the leaseholds it held in the MOB exceeded that statutory limit. Sacred Heart argues that the trial court erred by considering the cost of all the leaseholds as annual operating costs of Sacred Heart. Sacred Heart makes the same point we discussed above — that the trial court’s review on remand was limited to applying the POE application test to the specific SHMG leaseholds mentioned in our supreme court’s opinion. Indeed, our supreme court stated that, “[i]n examining the medical-building project as a whole, this Court does not refer to the entire ■ building constructed by Johnson Development, ... but to the portion of the building leased by the specific physicians’ practice seeking to apply the physician’s office exemption to the CON requirement.” Ex parte Sacred Heart, 155 So.3d at 983 n. 2. Thus, as we discussed above, we are constrained to agree with Sacred Heart, as discussed above, that the trial court was limited to considering those spaces in the MOB leased for use by SHMG physicians and that it was not to consider other areas of the MOB leased by Sacred Heart. Furthermore, because of our determination that the evidence supports a conclusion that the SHMG leased space in the MOB meets .the POE application test,- the SHMG leased space is not, by definition, a health-care facility. Therefore, we must reject the trial court’s application of § 22-21-263(a)(2) to the combined cost of all the Sacred Heart leaseholds in the MOB.
Our review of the record fails to support the trial court’s conclusion that the SHMG leased space fails to meet the four-factor POE application test set out in Ex parte Sacred Heart. The evidence supports a determination that the SHMG leased space, which consists of the family-practice area, the walk-in clinic, and a laboratory and diagnostic center in the MOB, meets the POE application test. Furthermore, the trial court’s decision to consider whether the application of the POE to the MOB as a whole would circumvent §§ 22-21-260(6), 22-21-260(8), 22-21-263, and 22-21-265, effectively, and inappropriately, added an additional factor to the POE application test. Thus, we must reject the trial court’s decision to require Sacred Heart to seek a CON for the MOB on the basis that allowing the SHMG leased space in the MOB to qualify for the POE would circumvent the CON statutes. Finally, we must also reject the trial court’s conclusion that Sacred Heart was required to seek and obtain a CON before operating in the MOB because the combined cost of all the *1002 leaseholds exceeded the threshold for new annual operating costs set out in § 22-21-263(a)(2). Our supreme court stated that it was proper to consider only those parts of the MOB leased for the SHMG physicians when applying the POE application test, because SHMG is the physicians’ office seeking the benefit of the POE. Accordingly, we reverse the judgment of the trial court, and we remand the cause to the trial court for the entry of a judgment consistent with this opinion.
2090239 — REVERSED AND REMANDED.
2120658 — REVERSED AND REMANDED.
PITTMAN, MOORE, and DONALDSON, JJ., concur.
THOMPSON, P.J., concurs in the result, without writing.

. In this opinion, we will use the same defined terms and designations we used in Sacred Heart Health System.

. See supra note 1.

. In this opinion, we use the same defined terms and designations the supreme court used in Ex parte Sacred Heart.

. See supra note 3.

. The evidence on remand indicates that the laboratory and the diagnostic center, which were originally planned to be housed in separate areas of the MOB, are now being housed together in one part of the MOB. Thus, in the remainder of this opinion, we will refer to them collectively as "the laboratory and diagnostic center.”

. We note that § 22-21-260(8) does not define "outpatient clinic.”

. As explained in our original opinion, Sacred Heart had planned to sublease the area intended to house an outpatient surgery center to another entity, Pleasure Island Ambulatory Surgery Center, LLC (“PIASC"). Sacred Heart Health Sys., 155 So.3d at 971. PIASC. sought a CON for an outpatient surgery center, but its request was denied; PIASC’s appeal from the denial of a CON to operate the outpatient surgery center was affirmed by this court without an opinion. Pleasure Island Ambulatory Surgery Ctr., LLC v. State Health Planning & Dev. Agency, 82 So.3d 17 (Ala.Civ.App.2010) (table).

. South Baldwin and IHS mention that SHMG is not a separate legal entity and that, in the end, the money billed for the services of SHMG physicians would be income for Sacred Heart. However, because § 22-21- *1000 260(6) clearly exempts physicians’ offices from the definition of health-care facilities and expressly notes that a physician’s office is entitled to this exemption "regardless of ownership,” the fact that SHMG is essentially owned by Sacred Heart is of no consequence.